UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22CR56-1 |
|---|---|---|
| v. | ) | |
| | ) | **FACTUAL BASIS** |
| AMRISH D. PATEL | ) | |
| | ) | |

NOW COMES the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

## Introductory Paragraphs

At the specified times, and at all relevant times:

1. AMRISH D. PATEL was a medical doctor licensed and residing in the state of Georgia. PATEL partnered with DWIGHT A. PEEBLES, JR. to open and operate various medical business ventures, starting with Atlanta Sports and Spine, LLC (d.b.a. Sports and Spine Institute) located in McDonough, Georgia and later expanding to Marietta, Georgia. PEEBLES regularly traveled back and forth to McDonough, Georgia but primarily resided in Mecklenburg County, North Carolina. PATEL and PEEBLES also did other business together, including real estate purchases in South Carolina.

2.      KP, a co-conspirator known to the United States Attorney, was initially a consultant and then later a business partner with PATEL and PEEBLES in many of their financial activities. KP assisted PATEL to secure bank loans through fraudulent means to finance and support Sports and Spine Institute and other business ventures. KP often referred to himself as the CFO of PATEL and PEEBLES' business entities when dealing with banks, though this title was never formalized.

3.      BM, a co-conspirator known to the United States Attorney, was a medical doctor licensed in North Carolina who resided and practiced in the Western District of North Carolina. PEEBLES introduced BM to KP; and KP and BM fraudulently obtain loans from financial institutions. KP and PEEBLES then misapplied the proceeds of these loans, in part to pay toward earlier loan balances for loans guaranteed by PATEL. BM also misapplied some of these loan proceeds for his own purposes.

4.      LJ, a co-conspirator known to the United States Attorney, resided in Georgia and was affiliated with several nominal business entities in Georgia and elsewhere, including Rhino Development Company, LLC.

5.      At different times relevant to this Bill of Information, members of the conspiracy, both known and unknown to the United States Attorney, did business under the following corporate entities:

   a. Lab Development Group (LDG), LLC;
   b. Lab Development Group, LLC;
   c. DLG Medical Sales, Inc.;
   d. Navitouch, LLC;
   e. Mathysen Consulting Group, LLC (d/b/a Mathysen Orthopedics);
   f. Rhino Development Company, LLC;
   g. Cryowell Holdings, LLC;
   h. Specialized Healthcare Services, LLC;
   i. Florida Institute of Medical Research, Inc.;
   j. Progressive Athletic Performance, LLC;
   k. Atlanta Sports and Spine, LLC;
   l. Atlanta Sports and Spine, Sports and Spine Institute, LLC;
   m. Atlanta Sports and Spine Management, LLC;
   n. MD Rejuvenation Centers, PA;
   o. Prism MSO, Inc.;
   p. Marko Properties and Development, LLC; and
   q. Concept Creations Corp.

6.  Beginning as early as September 2016, KP and other co-conspirators known and unknown to the United States Attorney, fraudulently sought and obtained bank loans using false and fraudulent statements. PATEL was the borrower for at least two of these loans and served as guarantor for most of the others. PATEL and PEEBLES joined the conspiracy in March 2017. The co-conspirators obtained these loans from financial institutions (as defined in Title 18, United States Code, Section 20) located within the Western District of North Carolina and elsewhere.

7.  Members of the conspiracy sought and obtained various types of loans. Some were loans that purported to be for the purchase of medical equipment. Others were loans to acquire residential homes or commercial real estate, or to perform construction or improvements on such real estate. Still other loans involved lines of credit or automobile loans.

8.  When seeking loans from these financial institutions, members of the conspiracy, both known and unknown to the United States Attorney, made material misrepresentations, either directly or indirectly, to the financial institutions, upon which the banks relied, to induce them to make the loans. These fraudulent statements included, among others:

    a. Misrepresentations about income and employment;
    b. Misrepresentations about the ownership of relevant business entities;
    c. False employment information, including false employment contracts and pay stubs;
    d. False information about the finances of the co-conspirators and their businesses, including the provision of false tax returns, false personal financial statements, and false bank account statements;
    e. Misrepresentations about the existence of medical equipment, including the provision of false equipment invoices;
    f. Misrepresentations about the financial condition of the co-conspirators and their business, including failing to disclose the existence of debts and other loans;
    g. Misrepresentations about the operations of relevant businesses;
    h. Misrepresentations about the intended purpose and use of the loan proceeds;
    i. Misrepresentations about the intent to occupy homes as primary residences;
    j. Misrepresentations about the actual source of funds used for down payments; and
    k. Misrepresentations about other collateral and the existence of valuable assets.

9.  From at least March 2016 through September 2020, members of the conspiracy closed on at least twenty-seven loans from financial institutions, totaling over $11 million. In each of these loans, one or more members of the conspiracy made material misrepresentations of fact to induce the financial institutions to make the loans. In addition to other material misrepresentations, the co-conspirators often would misapply the proceeds of these loans for purposes other than those represented to the financial institutions issuing the loans. The misapplied proceeds were used to

3

make payments on earlier loans, meet business expenses, or were distributed to PATEL, PEEBLES, KP, and others for personal use.

### Example #1: Four Loans from First South Bank (March-August 2017), Followed by Two Loans from First Bank (April-July 2019)

10. For example, in 2017, PATEL and KP applied for and received four loans from First South Bank, a financial institution located in South Carolina. The corporate entity that applied for all three loans was Lab Development Group, LLC, and PATEL was the guarantor for the loans. First South Bank was a financial institution that was insured by the Federal Deposit Insurance Corporation.

> a. **FSB Loan #1:** First South Bank closed on the first of these loans on or about March 16, 2017, in the amount of $329,206. KP represented to the bank that Lab Development Group, LLC was borrowing the money to purchase multiple pieces of medical equipment.
>
> b. **FSB Loan #2:** The second loan closed on or about June 27, 2017, in the amount of $198,175. KP again represented to First South Bank that the money was needed to acquire multiple pieces of medical equipment.
>
> c. **FSB Loan #3:** Also on or about June 27, 2017, First South Bank opened a $75,000 line of credit loan for Lab Development Group, LLC.
>
> d. **FSB Loan #4:** The fourth loan closed on or about August 22, 2017, in the amount of $1,104,300. KP represented to First South Bank that the loan had two purposes: first, some of the money was to be used to refinance an existing commercial real estate loan issued by Bank of Travelers Rest to purchase commercial property located at 135 Halton Village Circle, Lot G, Greenville, South Carolina; second, the remainder of the funds were to be used to construct a building and otherwise improve that property.

11. First South Bank relied upon the same loan package submissions from KP and PATEL for all four loans. These submissions contained several material misrepresentations upon which First South Bank relied when issuing the loans:

> a. KP and PATEL falsely represented to First South Bank that PATEL was the 100% owner of Lab Development Group, LLC, when in fact it was associated with KP and two other individuals known to the United States Attorney.

4

b. KP and PATEL falsely represented to First South Bank that PATEL was an employee of Sports and Spine Institute, LLC earning $350,000 per year, and that PEEBLES was the Chief Operating Officer of that company. In fact, PATEL owned Sports and Spine Institute, LLC and was not able to pay himself $350,000 per year from the business. KP and PATEL submitted to First South Bank a forged contract purporting to formalize PATEL's employment with Sports and Spine Institute, LLC. KP and PATEL made these false statements to inflate PATEL's income and to disguise the fact that he owned Sports and Spine Institute, a business located in a different state.

c. KP submitted forged corporate income tax returns for tax years 2014, 2015, and 2016 for Lab Development Group to First South Bank. These false tax returns were never filed with the IRS, and they falsely represented the business's total income for these years to be $698,581, $837,335, and $1,225,336, respectively. Lab Development Group did not, in fact, generate this income.

12. The proceeds from each of the equipment loans (**FSB Loan #1** and **FSB Loan #2**) were wired into the Bank of America corporate account of Navitouch, LLC. First South Bank believed that Navitouch, LLC was a third-party vendor that sold the equipment to Lab Development Group, when in fact it was controlled by KP (using an alias). KP then wired money from the proceeds of these loans from Navitouch's account to PEEBLES and PATEL, who in turn used the money for purposes other than to purchase medical equipment for Lab Development Group.

13. Part of the proceeds (approximately $75,000) of the $1,104,300 loan (**FSB Loan #4**) went to Bank of Travelers Rest to pay the release fee for the commercial property as intended. Draws from the remaining proceeds were distributed to a SunTrust corporate account in Florida for Rhino Development Company, LLC, an entity associated with LJ. Neither LJ nor Rhino Development Company were general contractors that performed construction work. LJ was an associate of KP. Some of the proceeds from these construction loan draws were used for the benefit of members of the conspiracy. For example, on several occasions money from these draws were used to make payments on other loans that had been obtained as part of the conspiracy.

14. In 2019, the conspirators paid off most of the remaining balances for the First South Bank loans with the proceeds from a new loan made at First Bank, a financial institution in Charlotte, North Carolina (and First South Bank later wrote off the remaining balances as a loss). PEEBLES introduced BM to KP; and BM and KP, with PEEBLES' knowledge, applied for and received two loans from First Bank:

5

a. **FB Loan #1.** On or about April 8, 2019, First Bank granted a loan of approximately $725,000 allegedly to purchase medical equipment. The borrower was MD Rejuvenation Centers, PA (a company belonging to BM), and the guarantors were BM and Concept Creations Corp.

b. **FB Loan #2.** On or about July 18, 2019, First Bank granted a second loan of approximately $1,136,000 for BM to purchase and develop the commercial property at 135 Halton Village Circle, Greenville, South Carolina (the property previously purchased by Lab Development Group and guaranteed by PATEL, financed by First South Bank). As with the first loan, the borrower was MD Rejuvenation Centers, PA, guaranteed by BM and Concept Creations Corp.

15. BM and KP submitted documents that contained material misrepresentations of fact, and First Bank relied upon these false statements when issuing the loans.

   a. Concept Creations Corp. was a business entity associated with KP, using an alias. BM, assisted by KP and PEEBLES, submitted to First Bank a false corporate tax return for Concept Creations Corp. for tax year 2018 purporting to demonstrate a total income of $2,268,481. However, Concept Creations Corp. did not file a tax return for 2018.

   b. BM and KP also submitted to First Bank forged corporate tax returns for MD Rejuvenation Centers, a business entity associated with BM, for tax years 2017 and 2018 that were never filed with the IRS. These forged tax returns showed total income of $2,229,017 and $2,673,500, respectively. The actual corporate tax returns for MD Rejuvenation Centers that were filed with the IRS for those tax years showed total income of $142,348 and $91,412, respectively.

   c. BM also submitted to First Bank forged individual tax returns for tax years 2017 and 2018 that were never filed with the IRS. These forged tax returns showed total income of $624,800 and $645,293, respectively. The actual individual tax returns that were filed with the IRS for those tax years showed total income of $233,819 and $209,511.

   d. After the loans closed, KP and PEEBLES portrayed themselves to First Bank as contract consultants who help doctors run and expand medical practices, and that they had been hired by BM for this purpose.

16. BM and KP misled First Bank about the intended purposes for the loan proceeds. After closing, funds from the equipment loan (**FB Loan #1**) moved through various accounts belonging to KP, PEEBLES, and BM. A significant portion of the loan proceeds was used for

6

personal expenses, investments, and purchases that did not involve the acquisition of medical equipment. PEEBLES later lied to First Bank about the existence of the medical equipment.

17. A portion of the proceeds of the $1,136,000 commercial property development loan (**FB Loan #2**) went to First South Bank to close out the first loan on the 135 Halton Village property (**FSB Loan #4**). The remainder was to be disbursed through draws as construction progressed. Some of the money was wired to Rhino Development Company, LLC to pay for construction costs, but First South Bank was unaware that Rhino Development Company, LLC was affiliated with LJ and KP and was not a construction company (see paragraph 13 above). Other funds from the loan moved between bank accounts associated with KP, PEEBLES, and BM. At the direction of KP, PEEBLES used proceeds from the loans to make payments on earlier loans guaranteed by PATEL. BM did not disclose to First Bank that he would receive cash from the proceeds of the loan. First Bank discontinued further disbursements in or around October 2019.

### Example #2: Three Loans from United Community Bank (April 2017)

18. In April 2017, PATEL and KP obtained three loans from United Community Bank in Greenville, South Carolina (UCB). UCB was an FDIC-insured financial institution.

   a. **UCB Loan #1.** PATEL and KP obtained a loan for $403,750 to purchase a commercial office space at 37 Brendan Way, Greenville, South Carolina. The borrowing entity was Cryowell Holdings, LLC, and was guaranteed by PATEL in his personal capacity and by Lab Development Group (LDG), LLC.

   b. **UCB Loan #2.** Another loan was for $652,705 to purchase medical equipment. The borrowing entity was Lab Development Group (LDG), LLC. PATEL also guaranteed this loan in his personal capacity.

   c. **UCB Loan #3.** The third was a $100,000 line of credit loan to Lab Development Group (LDG), LLC. PATEL also guaranteed this loan in his personal capacity.

19. UCB relied upon the same loan document submissions for all three loans, and all three loans closed on or about April 12, 2017. These submissions contained several material misrepresentations, upon which UCB relied when issuing the loans, including:

   a. PATEL and KP falsely represented to UCB that PATEL was the 100% owner of Lab Development Group (LDG)—just as they did with First South Bank. PATEL and KP also provided to UCB false articles of organization documents that purported to prove PATEL's association with Lab Development Group (LDG), but those documents were never filed with the Secretary of State.

7

b. KP submitted to UCB false corporate income tax returns for Lab Development Group for tax years 2014 and 2015. These false returns demonstrated total income of $698,581 and $837,335, respectively, for those tax years. These corporate tax returns were never filed with the Internal Revenue Service.

c. KP and PATEL falsely represented to UCB that PATEL was an employee of Sports and Spine Institute earning $350,000 per year. In fact, PATEL owned Sports and Spine Institute, LLC and was not able to pay himself $350,000 per year from the business. KP and PATEL submitted to UCB a forged contract purporting to formalize PATEL's employment with Sports and Spine Institute. KP and PATEL made these false statements to inflate PATEL's income and to disguise the fact that he owned Sports and Spine Institute, a business located in another state. KP also submitted a forged pay stub purporting to reflect this employment and salary arrangement.

d. KP also presented doctored bank statements to UCB. He submitted bank statements for accounts held in PATEL's name at Wells Fargo and PNC banks, and statements for a Lab Development Group account at BB&T bank. The balances were inflated substantially over the true amounts on deposit. Additionally, the forged Lab Development Group bank statements that were submitted pre-dated the actual opening of the account.

20. Most of the proceeds of the $403,750 loan (**UCB Loan #1**) were used to purchase the property at 37 Brendan Way as planned. In 2018, the remaining loan proceeds moved between accounts belonging to PATEL, PEEBLES, and KP. Most of these funds were not used to improve the property as promised, but instead were used for other purposes, including PATEL's wedding expenses.

21. The proceeds of the $652,705 loan to purchase medical equipment (**UCB Loan #2**) were wired to the Bank of America corporate account of Navitouch, LLC on or about April 12, 2017. UCB believed that Navitouch, LLC was a third-party vendor that sold the equipment to Lab Development Group, when in fact it was controlled by KP (using an alias). UCB received two invoices from Navitouch purporting to be bills for purchased medical equipment. One of these invoices was identical to one submitted to First South Bank by KP in support of the equipment loans there (**FSB Loan #1** and **FSB Loan #2**; see paragraph 14 above). KP later wired much of this money to PEEBLES, who did not use the funds to purchase medical equipment as promised. KP used approximately $140,000 of the loan proceeds to purchase a house for himself and his wife, LP. Members of the conspiracy did not disclose to UCB that the loan proceeds would be used for any purpose other than to acquire medical equipment.

**Example #3: Two Loans from Carolina Alliance Bank (January 2018)**

22. Another example of the fraud scheme occurred in January 2018. PATEL and KP sought and obtained two loans from Carolina Alliance Bank (CAB). CAB had branch offices in Greenville, South Carolina, but the bank's loan approval decisions were made in Asheville, North Carolina, within the Western District of North Carolina. CAB was an FDIC-insured financial institution.

   a. **CAB Loan #1.** On or about January 25, 2018, CAB closed on a $1,032,750 loan. KP represented to CAB that the loan had two purposes: first, some of the money was to be used to refinance an existing commercial real estate loan issued by Bank of Travelers Rest to purchase commercial property located at 121 Halton Village Circle, Greenville, South Carolina; second, the remainder of the funds were to be used to construct a building and otherwise improve that property. The borrower was Lab Development Group (LDG), LLC, and PATEL also personally guaranteed the loan.

   b. **CAB Loan #2.** On or about January 26, 2018, CAB closed on a $540,700 loan to purchase medical equipment. As with the other loan, the borrower was Lab Development Group (LDG), LLC, and PATEL personally guaranteed the loan.

23. CAB relied upon the same documents submitted by members of the conspiracy for both loans. These submissions contained material misrepresentations, upon which CAB relied, including:

   a. PATEL and KP submitted a false personal financial statement—dated December 15, 2017 and signed by PATEL—to CAB in support of the loan request. PATEL falsely claimed in the statement that he was paid an annual salary of $350,000 and that he possessed an art collection valued at approximately $600,000—neither was true. The statement also contained significantly inflated account balances for two Wells Fargo bank accounts.

   b. KP also submitted fraudulent documents purporting to be corporate tax returns for Lab Development Group, LLC for tax years 2014-2016. These false documents claimed that LDG reported to the IRS total income of $698,581, $837,335, and $1,225,336, respectively. However, Lab Development Group, LLC did not file any corporate tax returns for those tax years.

24. Part of the proceeds (approximately $90,000) of the $1,032,750 loan (**CAB Loan #1**) went to Bank of Travelers Rest to pay the release fee for the commercial property as intended. As in the First South Bank loan (see paragraph 13 above), many of the draws from the remaining proceeds were distributed to a SunTrust corporate account in Florida for Rhino Development

9

Company, LLC, an entity associated with LJ. Neither LJ nor Rhino Development Company were general contractors that performed construction work. LJ was an associate of KP. Some of the proceeds from these construction loan draws were used to pay co-conspirators. For example, on several occasions money from these draws were used to make payments on other loans that had been obtained as part of the conspiracy.

25. The proceeds of the $540,700 equipment loan (**CAB Loan #2**) were distributed to two different accounts on or about January 26, 2018. Approximately $47,570 was deposited into Lab Development Group's business account at CAB. KP and other conspirators submitted to CAB a false invoice from Navitouch that purported to show that Lab Development Group already had made a substantial down payment on the equipment. However, these loan proceeds were not used to purchase equipment. Instead, most of these loan funds were used, over time, to make loan payments on Lab Development Group's equipment and construction loans. The remaining equipment loan proceeds, approximately $491,764, were wired to the corporate account for Navitouch, LLC at Bank of America. CAB believed that Navitouch, LLC was a third-party vendor that sold the equipment to Lab Development Group, when in fact it was controlled by KP (using an alias). KP then wired some of these funds to PATEL and PEEBLES, who used them for purposes other than to acquire medical equipment for Lab Development Group.

### Example #4: Home Mortgage Loan from TD Bank (October 2017)

26. PATEL, assisted by PEEBLES and KP, also purchased two residential homes. One of these was located at 380 Montagu Drive, Spartanburg, South Carolina. On or about October 10, 2017, PATEL closed on a residential mortgage loan for that property through TD Bank in South Carolina. The amount of the loan was $660,000, plus an additional home equity line of credit for $82,417. TD Bank was an FDIC-insured financial institution.

27. Like the other business loans, PATEL and KP, assisted by PEEBLES, submitted false documents to induce TD Bank to make the loans, and TD Bank relied upon these material misrepresentations. These included:

    a. PATEL falsely claimed on the mortgage loan application that his monthly income was $27,000 and that he held over $600,000 in assets.

    b. KP submitted bogus corporate income tax returns for Lab Development Group, LLC for tax years 2015 and 2016 that claimed a total income of $837,335 and $1,225,336, respectively. That company did not file any corporate tax returns with the Internal Revenue Service for tax years 2015 or 2016.

    c. KP submitted doctored bank statements with inflated balances. TD Bank received fraudulent Wells Fargo bank statements for two of PATEL's personal accounts

for May and June, 2017, that were surreptitiously edited to substantially inflate the then-existing account balances.

d. KP doctored another bank statement to disguise the source of the down payment. TD Bank received an edited BB&T bank statement that purported to show that PATEL had approximately $12,500 in that account, from which approximately $8,250 was paid as earnest money toward the purchase of the home. That BB&T account, however, actually belonged to Lab Development Group, and the signatory to the account was KP (using an alias)—the true owner of the account was edited. The amount on deposit also was edited.

e. PATEL, PEEBLES, and KP falsely represented to TD Bank that PATEL was an employee of Sports and Spine Institute earning $350,000 per year. In fact, PATEL owned Sports and Spine Institute, LLC and was not able to pay himself $350,000 per year from the business. PATEL, PEEBLES, and KP submitted to TD Bank a forged contract purporting to formalize PATEL's employment with Sports and Spine Institute. They also submitted a letter purporting to be from a CPA indicating that PATEL did not own "Atlanta Sports and Spine" and a forged pay stub purporting to reflect this employment arrangement. PATEL, PEEBLES, and KP prepared a false document used in support of the loan application to inflate PATEL's income.

f. PATEL also falsely represented to TD Bank that the home at 380 Montagu Drive, Spartanburg, South Carolina, was intended for use as PATEL's primary residence, when in fact PATEL intended to continue to reside full-time in Georgia.

## ADDITIONAL DETAILS RELATING TO PATEL'S AND PEEBLES' MEMBERSHIP AND ROLE IN THE CONSPIRACY

28. In 2016, PATEL and PEEBLES hired KP to serve as a financial consultant and to assist PATEL and PEEBLES in obtaining bank loans to help Sports and Spine Institute to expand its business. PATEL and PEEBLES initially believed that KP would assist in obtaining these loans through entirely lawful means.

29. Between May 2016 and January 2017, KP obtained 10 loans for the purported benefit of PATEL and PEEBLES and their businesses. KP made material misrepresentations to the financial institutions to secure these loans, but KP kept PATEL and PEEBLES unaware these misrepresentations. During this period, KP also made misrepresentations to PATEL and PEEBLES about the status of the loans and the uses to which the loan proceeds were being put.

11

30. PATEL and PEEBLES joined the conspiracy in March 2017, and thereafter, directly or indirectly, added their own material misrepresentations to those made by KP to financial institutions to fraudulently secure bank loans.

31. On March 16, 2017, PATEL and KP, with PEEBLES' knowledge, applied for and received a loan from First South Bank for $329,206 (see Example #1, paragraphs 10-17 above). KP advised PATEL to falsely represent to the bank that PATEL was the 100% owner of Lab Development Group, LLC. PATEL complied with KP's request and made that false representation to the bank in connection with the loan application knowing that the information was both false and material to the bank's loan evaluation process.

32. PATEL also misrepresented to First South Bank, at KP's suggestion, that PATEL was an employee of Sports and Spine Institute earning $350,000 per year. In fact, PATEL owned Sports and Spine Institute and was not able to pay himself $350,000 per year from the business. PATEL knew that this was both false and material to the bank's loan evaluation process. To support that false representation, KP and PATEL submitted to First South Bank a fictitious contract, which PATEL signed, purporting to formalize PATEL's employment with Sports and Spine Institute, LLC.

33. In June and August, 2017, PATEL and KP, with PEEBLES' knowledge, applied for and received three additional loans from First South Bank (see Example #1, paragraphs 10-17 above). PATEL and PEEBLES knew that KP submitted the same misrepresentations to First South Bank as those submitted in March 2017, and understood that the information was both false and material to the bank's loan evaluation process.

34. In April 2017, PATEL and KP, with PEEBLES' knowledge, applied for and received three loans from United Community Bank (see Example #2, paragraphs 18-21 above). In connection with these loans, KP advised PATEL to falsely represent to the bank that he was 100% owner of Lab Development Group, LLC. PATEL also falsely represented to the bank that he was an employee of Sports and Spine Institute earning $350,000 per year, when in fact PATEL owned the company and was unable to pay himself $350,000 annually from the business. PATEL knew that these claims were both false and material to the bank's loan evaluation process.

35. In January 2018, PATEL and KP, with PEEBLES' knowledge, applied for and received two loans from Carolina Alliance Bank (see Example #3, paragraphs 22-25 above). To secure these loans, KP prepared a personal financial statement purporting to reflect PATEL's personal assets. The personal financial statement falsely represented that PATEL earned an annual salary of $350,000 and listed significantly inflated account balances for two Wells Fargo bank accounts. Knowing that this information was both false and material to the bank's loan evaluation process, PATEL nevertheless signed the personal financial statement containing the false information.

36. In October 2017, PATEL and KP, with PEEBLES' knowledge, applied for and received a residential mortgage loan from TD Bank (see Example #4, paragraphs 26-27 above). At KP's

request, PATEL made several material misrepresentations of fact to the bank. PATEL falsely claimed that his monthly income was $27,000. PATEL also falsely claimed that the home in Spartanburg, South Carolina would be his primary residence, when in fact PATEL intended to continue to reside full-time in Georgia. PATEL also falsely claimed that he was an employee of Sports and Spine Institute earning $350,000 annually, when in fact PATEL owned the business and could not pay himself $350,000 per year from it. PATEL and PEEBLES both signed the false employment contract that purported to memorialize this arrangement that was submitted to the bank. Both PATEL and PEEBLES knew that these claims were both false and material to the bank's loan evaluation process.

37. PEEBLES introduced BM to KP. In 2019, BM and KP applied for and received two loans from First Bank (see Example #1, paragraphs 14-17 above). PEEBLES and KP falsely claimed that BM hired them as contract consultants to help expand BM's medical practice. KP and BM also misled the bank about the intended use of the funds. Proceeds from these two loans moved between bank accounts belonging to PEEBLES, KP, and BM and were used for purposes other than those promised to the bank. PEEBLES knew that these misrepresentations were material to the bank's loan evaluation process.

DENA J. KING
UNITED STATES ATTORNEY

DON GAST
ASSISTANT UNITED STATES ATTORNEY

Defendant's Counsel's Signature and Acknowledgment

I have read this Factual Basis, the Bill of Information, and the plea agreement in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis, the Bill of Information, and the plea agreement. I hereby certify that the defendant does not dispute this Factual Basis.

STUART NASH, Attorney for Defendant

DATED: 3/3/22

13